United States Court of Appeals
Fifth Circuit

**F I L E D**

December 23, 2005

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

———————

m 04-30037

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JERRY W. FREEMAN,

Defendant-Appellant.

———————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————

Before JOLLY, SMITH, and DEMOSS,
 Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Jerry Freeman challenges his conviction of and sentencing for conspiracy, wire fraud, travel fraud, and money laundering. Although the district court correctly decided most of the issues on appeal, it did commit reversible error under *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). For this reason, we affirm the conviction but vacate and remand for resentencing.

I.

Freeman was indicted alongside co-defendant Motillal Sudeen on 1 count of conspiracy in violation of 18 U.S.C. § 371, 14 counts of wire fraud in violation of 18 U.S.C. § 1343, 1 count of travel fraud in violation of 18 U.S.C. § 2314, and 22 counts of money laundering in violation of 18 U.S.C. § 1957. Freeman worked at Sudeen's pharmacy and as-

sisted Sudeen in various business ventures unrelated to pharmaceuticals.

The government presented evidence that Sudeen had created a large Ponzi scheme that involved telling investors that he would invest their funds in high yield programs or "private placement secured trading programs" involving overseas trades of financial instruments. He told investors they would receive a higher-than-market rate of return and that their principal would remain safe, exposed to little or no risk, and would be returned on the expiration of the investment returns. He represented that the trading programs involved highly rated banks, were monitored by the federal government, and would fund humanitarian projects in developing countries. He assured investors that he had earned profits for himself and others by making similar investments. The funds, however, were never invested as promised, but instead were used for personal enrichment and to make "lulling payments" to prior investors to make them believe that their initial investments were profitable.[1]

Sudeen and Freeman increased the appearance of legitimacy and safety of the investments by giving investors bogus "Private Placement Agreements" or "Joint Venture Agreements," guarantees and promissory notes. They also told investors that their funds were guaranteed by Sudeen's personal wealth. They instructed investors to purchase Certificates of Deposit from banks to allow Sudeen to use the credit as collateral for loans, the proceeds of which would also be invested, and they represented that a fictitious minimum investment was required to participate.

Continued participation was ensured by lulling payments, encouraging investors to roll over their investments rather than seeking immediate returns, and by reassuring investors that the funds were safely invested and soon would result in returns. When investors demanded proceeds, the defendants would claim that the profits could not be paid because the investors had failed to comply with false requirements, that the profits were tied up by the federal government, or that they could not be liquidated from overseas investments.

The government presented evidence that the defendants were involved in another fraudulent Ponzi scheme involving the trade of insulin contracts, although they were not indicted for that scheme. Freeman was involved in the insulin contracts by giving the investors checks as initial, false profit returns; meeting with investors to encourage and sign contracts related to their continued participation in the scheme; and assuring investors that "everything is legal." When one investor told Freeman she wanted to withdraw money, Freeman gave her three checks totaling $10,000 and informed her that the remainder of her money had "two more banks to clear" before being returned. The money invested for insulin trade was co-mingled with other investment funds gained by the defendants' various fraudulent schemes, and the funds received from insulin investors were used to make lulling payments.

Although the defendants were indicted together, the court severed the trials. Freeman was convicted on all counts and was sentenced to 108 months' imprisonment.

---

[1] More than fifty people participated in the high-yield trading program, and the victims named in the indictment gave over $17 million to the defendants. The funds were used to make lulling payments and to pay Freeman's salary, remodel Sudeen's home, support Sudeen's wife and children, purchase property including luxury automobiles, and to make credit card payments.

## II.

Freeman argues that the district court erred in admitting evidence regarding the insulin investment scheme; he claims the evidence was not intrinsic to the offenses enumerated in the indictment and also did not satisfy Federal Rules of Evidence 403 and 404(b). Freeman properly objected on this ground; we review the admission of the evidence for abuse of discretion. *See United States v. Hicks*, 389 F.3d 514, 522 (5th Cir. 2004).

Extrinsic evidence is not admissible to prove propensity to commit the charged crime, *see* rule 404(a), but may be admissible for other purposes enumerated under rule 404(b). Intrinsic evidence is generally admissible, and its admission is not subject to rule 404(b). *See United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996). Evidence of acts other than conduct related to the offense is intrinsic "when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990) (internal citations omitted).[2]

The district court did not abuse its discretion in admitting the evidence regarding the insulin investment scheme, because it was intrinsic to the charged offense, involving the high yield investment scheme. The evidence regarding the insulin investors was inexorably intertwined with the charged scheme as "part of a single criminal episode," id.: The uncharged offense arose out of the same series of transactions, because the funds were co-min-gled and used to make lulling payments to investors from both schemes.[3]

## III.

Freeman contends the insulin scheme evidence constituted an impermissible constructive amendment of his indictment, or alternatively a fatal variance. Although Freeman broadly outlines the elements of each claim, he does not specifically delineate how the introduction of the evidence modified an essential element of the offense so as to constitute a constructive amendment. Therefore, the claim of constructive amendment is waived for inadequate briefing; we proceed to consider only Freeman's claim that there was a fatal variance.

A variance occurs when the charging terms of an indictment remain unaltered but the evidence at trial proves facts other than those alleged. *See United States v. Puig-Infante*, 19 F.3d 929, 935 (5th Cir. 1994). A variance is reviewed for harmless error; "[a] defendant cannot prevail on such a claim unless he demonstrates that the variance was material and prejudiced his substantial rights." *United States v. Guidry*, 406 F.3d 314, 322 (5th Cir.), *cert. denied*, 126 S. Ct. 190 (2005). "As long as the defendant receives notice and is not subject to the risk of double jeopardy, his substantial rights are not affected." *Id.* (quoting *United States v. Mikolajczyk*, 137 F.3d 237, 243 (5th Cir. 1998)).

As we have said, the insulin investment scheme evidence was intrinsic to the charged

---

[2] Such evidence is generally admissible to "complete the story of the crime." *United States v. Walters*, 351 F.3d 159, 166 n.2 (5th Cir. 2003).

[3] *United States v. Dula*, 989 F.2d 772, 777 (5th Cir. 1993) ("Evidence of an uncharged offense arising out of the same transaction or series of transactions as the charged offense is not an 'extrinsic' offense within the meaning of rule 404(b), and is therefore not barred by this rule.")

conspiracy offense, because the schemes were inextricably intertwined. Because the insulin investment scheme evidence proved facts that were alleged in the indictment, there was no variance.

## IV.

Freeman claims the district court erred in denying his motion for a mistrial made after the government had elicited testimony barred by a ruling of the district court. Freeman testified on direct examination that he assisted Sudeen in business ventures relating to a failed attempt to import shrimp from Guyana. On cross-examination, he denied altering an invoice to help Sudeen receive more money from a lawsuit filed against the shrimp supplier.

The government called a witness who had worked with the defendants when they were involved in importing shrimp; he testified that Sudeen wanted to strengthen the lawsuit and asked him to increase the amount of the original invoice. Freeman objected to this testimony on the ground that it was impermissibly offered to show his involvement in other bad acts unrelated to the indictment. The district court sustained the objection.

Despite the court's admonition, the government proceeded to show the witness an altered invoice and asked whether he had a belief as to who had altered the document and sent it in connection with the lawsuit. Freeman objected again and moved for a mistrial. The court granted the objection but denied the motion, and instructed the jury to disregard any specific reference to the shrimp material.

Freeman argues that he was entitled to a mistrial because he contends the curative instruction was insufficient to cure any prejudice. We review this claim for abuse of discretion. *See United States v. Honer*, 225 F.3d 549, 555 (5th Cir. 2000). "[A] new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record." *United States v. Paul*, 142 F.3d 836, 844 (5th Cir. 1998). "In determining whether a prosecutor's remarks constitute reversible error, [the court] consider[s] the magnitude of the prejudicial effect of the statements, the efficacy of any cautionary instruction, and the strength of the evidence of guilt." *United States v. Robles-Vertiz*, 155 F.3d 725, 731 (5th Cir. 1998).

We dismiss Freeman's argument because he has failed to explain how the error would have a substantial prejudicial impact on the verdict. Although his theory is completely conclusional, the government correctly points out that even if the prosecutor asked an improper question, prejudice was minimal; the question was never answered by the witness. Moreover, the curative instruction was sufficiently plain and broad to prevent prejudice. The district court did not abuse its discretion in denying a mistrial.

## V.

Freeman avers that the evidence was insufficient to support a conviction. "In resolving a sufficiency of the evidence claim, we must decide whether a rational trier of fact could have found that each element of the charged criminal offense was proven beyond a reasonable doubt."[4] We consider all the evidence in a light most favorable to the government, drawing all inferences and credibility choices in

---

[4] *United States v. Arnold*, 416 F.3d 349, 358 (5th Cir.), *cert. denied*, 126 S. Ct. 504 (2005); *see also United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998).

its favor. *Id.* Freeman challenges the sufficiency of the evidence for the conspiracy count, the travel fraud count, one count of wire fraud, and one count of money laundering.

## A.

Count one charged Freeman with conspiracy to violate wire fraud, travel fraud, and money laundering statutes in violation of 18 U.S.C. § 371. To establish a violation of § 371, the government must prove: "(1) an agreement between two or more person to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir. 2001).

Freeman claims the evidence was insufficient to prove the first elementSSwhether a conspiratorial agreement existed. Freeman suggests that the evidence was deficient because there was no *direct* evidence of an agreement, because no testimony was introduced from any alleged co-conspirator. This argument is without merit, because it is well-settled that the government does not need to show that the conspiratorial agreement was explicit or formalSSproof of a tacit agreement is sufficient.[5]

There is a wealth of evidence from which a reasonable jury could conclude that the agreement element of the conspiracy charge was satisfied,[6] including Freeman's admission that he was aware that the investors' funds were being used for items unrelated to the investment program. This, combined with evidence that Freeman was intimately familiar with Sudeen's business from being his only employee for many years, was sufficient to establish a conspiratorial agreement and to support Freeman's conviction under § 371.

## B.

Freeman urges that the evidence was insufficient to support his conviction of aiding and abetting travel fraud under § 2314. The travel fraud count of the indictment specifically charged Freeman with aiding and abetting Sudeen in inducing a particular investor, Joseph D'Amico, to travel from New Orleans to Poplarville, Mississippi, as part of the fraudulent high yield investment scheme. To prove travel fraud, the government must demonstrate "(1) that the defendant devised a scheme intending to defraud a victim of money or property of a minimum value of $5,000, and (2) that as a result of this scheme, a victim was induced to travel in interstate commerce." *United States v. Richards*, 204 F.3d 177, 206 (5th Cir. 2000) (internal citations omitted). To show aiding and abetting liability, the government had to

---

[5] *United States v. Westbrook*; 119 F.3d 1176, 1189 (5th Cir. 1997) ("To be a conspiracy, an express, explicit agreement is not required; a tacit agreement is enough."); *United States v. Robertson*, 659 F.2d 652, 656 (Former 5th Cir. Oct. 1981) ("One may be convicted of conspiracy even though the Government fails to prove an explicit or formal agreement to establish the conspiracy.").

[6] Evidence indicated that Freeman was personally involved in many of the aspects of the scheme, including typing and witnessing many of the fraudulent agreements, maintaining financial records of the funds, and transferring funds used in the scheme. He also made misrepresentations to the investors, including claims that they could not receive their funds promptly for false reasons and reports that the funds they did receive in return were investment profits, when in fact they were funds from other investors.

prove that Freeman knowingly and deliberately associated with a criminal venture, participated in the venture, and sought by his actions to make it succeed. *See United States v. Polk*, 118 F.3d 286, 295 (5th Cir. 1997).

Freeman claims there was no evidence that he was involved in any scheme to defraud D'Amico, but this contention is without merit. Evidence demonstrated that Freeman was personally involved[7] and was sufficient for a reasonable jury to find Freeman guilty on the travel fraud count.

### C.

Freeman challenges his conviction on one of the wire fraud counts and one of the money laundering counts, both dealing with a particular victim-investor, Krystoff Lukaszuk. To prove wire fraud in violation of § 1343, the government had to show that "a defendant knowingly participated in a scheme to defraud, that interstate wire communications were used to further the scheme, and that the defendant[] intended that some harm result from the fraud." *Richards*, 204 F.3d at 207. To prove the money laundering count under § 1957, the government had to prove that Freeman knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000 and that the property was derived from specified unlawful activity. *See*

---

[7] D'Amico testified that he gave Sudeen a $2 million check for investment in the high yield investment program, and Freeman admitted that he typed and signed the private agreement that lured his investment. D'Amico also testified that Freeman attended the meeting at which Sudeen explained the structure of the investment. D'Amico's check was deposited in one of Sudeen's accounts for which Freeman was a signatory, the funds of which were traced to lulling payments that Freeman made to other investors.

*United States v. Dupre*, 117 F.3d 810, 821 (5th Cir. 1997).

Freeman argues that the evidence was deficient because Lukaszuk was not a witness at trial; Freeman claims the record is otherwise devoid of evidence that false representations were made to Lukaszuk. This is incorrect; Lukaszuk's testimony was not necessary, because Freeman typed Lukaszuk's agreement; Lukaszuk wired money to Freeman and Sudeen that was not invested in high yield investments as promised; and Freeman made lulling payments to Lukaszuk, as exhibited by requests for wire transfers that Freeman signed. Moreover, a government expert traced a $10,500 personal expenditure made by the defendants from Lukaszuk's funds. The evidence was sufficient to allow a reasonable jury to find Freeman guilty of both the wire fraud and money laundering counts dealing with Lukaszuk.

### VI.

Freeman posits that the district court gave improper jury instructions. A properly objected-to instruction is reviewed for abuse of discretion. *See United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002). We consider whether the instruction, taken as a whole, "is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *Id.*

Freeman asserts that the district court committed reversible error in instructing the jury that he acted "knowingly" if he acted with deliberate ignorance or willful blindness, because, he claims, the instruction was not supported by the evidence. The deliberate indifference charge permits "the jury to convict without finding that the defendant was aware of the existence of illegal conduct." *United*

*States v. Moreno*, 185 F.3d 465, 476 (5th Cir. 1999).

We have previously upheld the deliberate indifference instruction, provided it has the required factual basis. *See id.* The proper factual basis is present if the record supports inferences that "(1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *United States v. Scott*, 159 F.3d 916, 922 (5th Cir. 1998). In determining whether the evidence supports the charge, the evidence and all reasonable inferences that may be drawn from it are viewed in the light most favorable to the government. *See United States v. Sharpe*, 193 F.3d 852, 871 (5th Cir. 1999).

First, there is a wealth of evidence that supports an inference that Freeman was subjectively aware of a high probability of the existence of illegal conduct. He was involved in typing and witnessing the agreements with the investors that promised exorbitant returns, and he was a signatory on the accounts into which the investments were deposited. Although he was aware of the arrangements, he wired funds into the account and checked on the balances on a daily basis and wrote checks from them for items entirely unrelated to investments. Moreover, Freeman maintained financial records that reflected that investor funds were used to pay Sudeen's corporate and personal expenses and to make payments to other investors. Freeman was aware that Sudeen had been accused of fraud by several investors and was being investigated by the FBI.

Next, there is sufficient evidence to support an inference that Freeman purposely contrived to avoid learning of the illegal conduct in-

volved in this case. Although there is no evidence that Freeman took any affirmative acts to avoid knowledge, we have previously recognized that where the likelihood of criminal wrongdoing is so high, and the circumstances surrounding a defendant's activities are extremely suspicious, a failure to conduct further inquiry justifies an inference of deliberate indifference.[8] Here, Freeman was intimately involved in the finances of Sudeen's operations and should have made an inquiry into the legitimacy of the transactions based on the immense number suspicious circumstances previously described.

Finally, Freeman argues that the district court erred by giving the deliberate indifference instruction, where the government proceeded on a theory of actual knowledge at trial. This argument is without meritSSwe have previously held that a deliberate indifference instruction is not inconsistent with

---

[8] *United States v. Faulkner*, 17 F.3d 745, 766 (5th Cir. 1994) ("We have held that in some cases the likelihood of criminal wrongdoing is so high, and the circumstance surrounding a defendant's activities and cohorts are so suspicious, that a failure to conduct further inquiry or inspection can justify the inclusion of the deliberate ignorance instruction.") (internal citations omitted); *see United States v. Gray*, 105 F.3d 956, 967 (5th Cir. 1997) (holding that the deliberate indifference instruction was appropriate where the defendant handled calls from irate loan applicants who received no money, but made only made a trivial attempt to discern whether anything was wrong); *see also United States v. Stouffer*, 986 F.2d 916, 925 (5th Cir. 1993) (holding that the deliberate indifference instruction was appropriate where corporate officer used investment company funds for personal purposes, "blindly accept[ing]" co-defendant's representation that the company's charter authorized the expenditures).

evidence of actual knowledge.[9] The district court did not commit reversible error in instructing the jury on deliberate indifference.

## VII.

Freeman claims the district court improperly used the 2002 edition of the sentencing guidelines instead of the 2000 edition.[10] Although we discuss this issue as part of our "*Booker* error" analysis, the objection actually subdivides into two distinct inquiries, only one of which *Booker* technically controls: (1) whether the use of the 2002 edition constitutes an independent *Booker* error and (2) whether the use of the 2002 edition violated the *Ex Post Facto* Clause (a claim we analyze the same as we would have before *Booker*).

### A.

Freeman claims his sentence is infirm under *Booker*, in which the Court made plain that under the Sixth Amendment, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to the jury beyond a reasonable doubt." *Booker*, 543 U.S. at ___, 125 S. Ct. at 756. Freeman asserts that the district court's factual determination that the conspiracy extended past the amendment of the guidelines violated his Sixth Amendment rights under *Booker.*

### 1.

The government, however, contends that Freeman did not properly preserve his *Booker* objection and that we should thus review his challenge for plain error.[11] The government is incorrect.

At sentencing, Freeman argued that where, "like *Apprendi*," the factual determination of when the conspiracy existed has the "practical effect" of increasing the maximum for the offense, it should be looked at as an issue that the "jury has to decide." Despite the fact that he did not express reliance on *Apprendi* (earlier, counsel stated that he could "not in good faith argue *Apprendi* fits [the] case"), and although he never explicitly mentioned the Sixth Amendment or *Blakely* before the district court, his objections adequately apprised the court that he was raising a Sixth Amendment violation to the guidelines edition issue based on the ground that the government did not prove to the jury beyond a reasonable doubt that the conspiracy extended past November 1, 2001.[12]

---

[9] *United States v. Saucedo-Munoz*, 307 F.3d 344, 349 (5th Cir. 2002) (noting that relevant cases do not "suggest[] that a deliberate ignorance instruction is improper where evidence may be construed as showing either actual knowledge or contrivance to avoid learning the truth. Instead, [the] precedent suggests that a deliberate ignorance instruction may be given alongside evidence of actual knowledge.").

[10] The government posits that the court actually used the 2003 version, which was in effect on the date of sentencing. The difference is irrelevant, because § 2S1.1 is the same in both. Use of the 2000 version, as urged, would have yielded a substantially lower range.

[11] *See Guidry*, 404 F.3d at 322 (reviewing *Booker* error under plain error standard where defendant failed to object on the appropriate Sixth Amendment grounds at sentencing).

[12] This case is analogous to the situation we confronted in *United States v. Akpan*, 407 F.3d 360, 375 (5th Cir. 2005), in which the sentencing range was increased based on the district court's
(continued...)

## 2.

### a.

On the merits of the issue, Freeman also is correct. Freeman asserts that, under *Booker*, the district court cannot constitutionally have made factual determinations regarding the end-date of the conspiracy. Freeman neither admitted that end-date, nor was it found by a jury beyond a reasonable doubt. Nevertheless, that finding plainly increased his sentencing range.

There is no dispute that if the conspiracy was proven to extend to a date on or after November 1, 2001, a set of guidelines later than the 2000 version would apply (in an advisory capacity, of course, in the wake of *Booker*). The indictment states that "[b]eginning in or about March 1997, and continuing to the present [meaning February 28, 2002], . . . the defendants . . . did knowingly and willfully . . . conspire . . . ." The indictment charges the overt acts under the conspiracy with specificity; the latest such charged act is Sudeen's promise to pay a particular investor additional money, an act alleged to have occurred "[i]n

---

[12](...continued)
determination that the range of financial loss was over one million dollars. We found that defendant had preserved his objection on *Booker* grounds because he repeatedly objected to the court's determination of the amount of financial loss on the ground that the "figure had not been proven at trial." *Id.* at 376. We concluded that "[a]lthough [the defendant] never explicitly mentioned the Sixth Amendment, *Apprendi*, or *Blakely* until his Rule 28(j) letter, we are satisfied that his objection adequately apprised the district court that [the defendant] was raising a Sixth Amendment objection to the loss calculation because the government did not prove to the jury beyond a reasonable doubt that the loss was between five to ten million dollars." *Id.*

---

or about August 2001."

In its brief on appeal, the government, in an effort to avoid use of the 2000 guidelines, points to proof of several acts occurring on or after November 1, 2001.[13] The government

---

[13] According to the government's brief,

Freeman continued to receive biweekly salary payments of $1,450 through January 17, 2002, and $9,000 was wired to co-conspirator Walter Lauren at an account in Switzerland as late as February 27, 2002. Mortgage payments on the Poplarville property using funds from investors were made until January 15, 2002. In addition, lulling payments of $10,000, $2,000, and $2,500 were made to investors Frank Gunn, Kenneth Breaux and Sheran Frickey, respectively, on December 12, 2001. In November 2001, Sudeen promised that he would give a bank guarantee to investor Mattias Baumeler. In February 2002 Baumeler met with Sudeen in Switzerland, and Sudeen promised that he would remit all overdue profits within two weeks.

Moreover, Alice Celestin testified at trial and sentencing that every 120 days she and her husband "rolled over" their principal and purported interest payments into a new contract. When she met with Freeman on July 1, 2001, and signed a fifth contract, she advised him that she was going to need $54,000 back in November. When she didn't receive the money, she telephoned Freeman frequently. In December 2001 Freeman called her and said that he had both good news and bad news: she was getting money, but it was only $10,000. They met the next day and he gave her three separate checks totaling $10,000. She testified that at that time she still believed that she had funds invested in insulin. She continued calling Freeman and during their last conversation in February 2002 he said that her funds had "two more banks to

(continued...)

---

also accurately points to the fact that at sentencing, the district court made a finding that the conspiracy continued past November 1, 2001. The flaw in the government's position, however, is that the procedure it correctly recounts is the very essence of a *Booker* violation.

The jury was charged in relevant part as follows:

> It is not essential that the Government proved that the conspiracy started and ended on those specific dates [i.e., March 1997 through February 2002]. Indeed it is sufficient if you find that in fact a conspiracy was formed and that it existed for some time within the period set forth in the Indictment and that at least one overt act was committed to further the conspiracy within that period of time.

Accordingly, the fact of conviction does not necessarily establish that the jury found the existence of any overt acts on or after November 1, 2001. It was only the district court, and not the jury, that found that the conspiracy continued beyond the trigger date for the post-2000 guidelines.[14] This is specifically what

*Booker* prohibits: The

> actual sentence . . . was . . . longer than the Guidelines range supported by the jury verdict alone. To reach this sentence, the judge found facts beyond those found by the jury . . . . '[T]he jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact' [quoting *Blakely v. Washington*, 542 U.S. 296, 305 (2004)].

*Booker*, 543 U.S. at ___, 125 S. Ct. at 751.

In short, the indictment charged no specific acts after August 2001, and the jury was told it could find defendants guilty without finding any overt acts on or after November 1, 2001. There is no basis on which, in the wake of *Booker*, we can infer that any such acts indeed occurred, *i.e.*, that the jury, if asked, would have found them beyond a reasonable doubt.[15]

---

[13](...continued)
clear." Freeman's misrepresentations plainly lulled Mrs. Celestin into the continued belief that her funds were safely invested and that the promises made at the time of her initial investment would be fulfilled.

(Record citations and footnote omitted.)

[14] The government relies entirely on the fact that the *district court* found that the conspiracy continued past November 1, 2001. At no point does the government even attempt to argue that we may
(continued...)

[14](...continued)
infer that the jury made any such finding, much less that it did so beyond a reasonable doubt.

[15] It is true that under the law of this circuit, "[o]rdinarily, a defendant is presumed to continue involvement in a conspiracy unless that defendant makes a 'substantial' affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose." *United States v. Puig-Infante*, 19 F.3d 929, 945 (5th Cir. 1994) (citation and internal quotation marks omitted). *Accord United States v. Schorovsky*, 202 F.3d 727, 729 (5th Cir. 2000). These authorities, although sound, address a situation entirely different from the one presented here; they involve multi-person conspiracies in which the defendant claims he tried to withdraw from the conspiracy that was continued by his co-conspirators. Here, there were no acts *found by a jury* after the trigger date, so there is no *jury-found* conspiracy at all that existed on or after that date.
(continued...)

10

### b.

Because Freeman's sentence is infected with *Booker* error, and he properly preserved his objection, we must vacate the sentence and remand for resentencing unless we determine that the error was harmless under Federal Rule of Civil Procedure 52(a). *See United States v. Mares*, 402 F.3d 511, 520 n.9 (5th Cir.), *cert. denied*, 126 S. Ct. 43 (2005). "Harmless error is 'any defect, irregularity, or variance that does not affect substantial rights of the defendant,' and 'arises when the mistake fails to prejudice the defendant.'"[16] Under this standard the government must demonstrate, beyond a reasonable doubt, that the error did not contribute to the sentence that the defendant received. *See United States v. Olano*, 507 U.S. 725, 734 (1993).

The government does not meet this burden. It points to nothing that would show beyond a reasonable doubt that the court would have imposed the same sentence under an advisory guidelines regime. *See Akpan*, 407 F.3d at 377.[17]

### B.

We do not reach Freeman's *ex post facto* claim. Under *Akpan*, *id.* at 360 n.2, we have the authority to leave to the district court the discretion to consider this argument as long as we have already determined there was a reversible *Booker* violation

In summary, the judgment of conviction is AFFIRMED. The judgment of sentence is VACATED and REMANDED for further proceedings in accordance with this opinion.

---

[15](...continued)

In other words, those authorities demonstrate that the absence of an overt withdrawal can extend the operative dates of an alleged withdrawing defendant's vicarious liability to the end of the conspiracy. Those authorities do not suggest, however, that the absence of an overt withdrawal extends the length of the conspiracy itself.

[16] *Akpan*, 407 F.3d at 376-77 (quoting rule 52(a); *United States v. Munoz*, 150 F.3d 401, 413 (5th Cir. 1998)).

[17] Without the factual finding made by the district c ourt, it would have been required to apply the 2000 edition of the guidelines manual, which would have resulted in an offense level of 26, rather than the level of 31 that was reached using (continued...)

[17](...continued)
the 2002 edition.

E. GRADY JOLLY, Circuit Judge, dissenting in part:

I respectfully dissent from the majority's finding of <u>Booker</u> error based on the district court's application of the 2002 version of the Guidelines. I would affirm Freeman's sentence: No <u>Booker</u> error exists because whether the conspiracy continued until the effective date of the 2002 Guidelines is in this case a question of law, not a question of fact.

The Guidelines provide that the court apply the version of the Guidelines in effect on the date that the defendant is sentenced; if such use implicates the <u>Ex</u> <u>Post</u> <u>Facto</u> clause of the Constitution, the court is directed to apply the version in effect on the date the offense of conviction was committed. USSG § 1B1.11. Because the 2002 Guidelines became effective on November 1, 2001, the proper inquiry in this case is whether the offense of conviction, the criminal conspiracy, was committed before, on or after, November 1, 2001.

The indictment filed against Freeman on February 28, 2002 alleged a conspiracy "[b]eginning in or about March 1997, and continuing to the present. . . ." Thus, the indictment clearly alleged that the offense of conviction was committed when the 2002 Guidelines applied. The jury returned a general verdict finding Freeman guilty of the offense charged in the indictment. I would hold that the jury's general verdict against Freeman on the count alleged in the indictment is sufficient to affirm the district court's sentence. No <u>Booker</u> error exists because Freeman was sentenced on

12

the jury's finding that he was guilty of participating in a criminal conspiracy that continued until at least February 28, 2002.

The majority, however, relies on the jury instructions to conclude that the jury's verdict is insufficient to establish that the conspiracy continued past the effective date of the 2002 Guidelines. The jury was instructed in relevant part:

> It is not essential that the Government proved that the conspiracy started and ended on those specific dates. Indeed it is sufficient if you find that in fact a conspiracy was formed and that it existed for some time within the period set forth in the Indictment and that at least one overt act was committed to further the conspiracy within that period of time.

Such an instruction, according to the majority, did not require that the jury find the end date of the conspiracy beyond a reasonable doubt. The majority further reads this instruction to mean that the fact of conviction does not necessarily establish that the jury found the commission of any overt acts on or after November 1, 2001.[18] Panel Opinion at __. Assuming that the majority is correct, I cannot agree with the majority's conclusion that the district court must have found facts in order to determine that the conspiracy continued after November 1, 2001, resulting in Booker error. Panel Opinion at __.

As a matter of law, a conspiracy continues until the evidence affirmatively shows that the

---

[18]In fact, the jury instructions do not require that the jury find any specific date for any overt act. The majority's reliance on the jury instruction to explain that the jury could not have found an overt act to have occurred after November 1, 2001 is misplaced. Because the jury returned a general verdict, we do not know whether the jury may have relied on an unalleged overt act not appearing in the indictment.

conspirators terminate the alleged conspiracy, or with respect to conspirators individually, until the conspirators withdraw.[19] The unchallenged affirmative evidence establishes that the defendant's scheme and the purposes underlying the scheme continued well past November 1, 2001. Furthermore, with respect to the defendant, "[a] defendant is presumed to continue involvement in a conspiracy unless she makes a 'substantial affirmative showing of withdrawal, abandonment, or defeat of a conspiratorial purpose.'" United States v. Schorovsky, 202 F.3d 727, 729 (5th Cir. 2000) (quoting United States v. Puig-Infante, 19 F.3d 929, 945 (5th Cir. 1994)). None of these events ever occurred before the return of the indictment. "To establish withdrawal a defendant bears the burden of demonstrating affirmative acts inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach conspirators." Id. Freeman never claimed that he withdrew from the conspiracy. As such, his guilt of engaging in a criminal conspiracy continued as a matter of law through the time of the indictment. The district court, therefore, did not commit

---

[19]See 4 WHARTON'S CRIMINAL LAW § 688 (15th ed.) ("A conspiracy is terminated when its purpose has been accomplished, i.e., the target offense has been committed, or when the conspirators agree to abandon their criminal purpose; thereafter, no act or declaration of a former conspirator can be attributed to another."); see also United States v. Mayes, 512 F.2d 637, 642-43 (6th Cir. 1975) ("A conspiracy is completed when the intended purpose of the conspiracy is accomplished. But where a conspiracy contemplates a continuity of purpose and continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated[.]").

Further, as Judge Jones recently noted in United States v. Olis,

> [t]his court has held that conspiracy "is a continuing offense" and that "[s]o long as there is evidence that the conspiracy continued after the effective date of the [amendments to the] guidelines, the Ex Post Facto Clause is not violated." Moreover, unless a conspirator effectively withdraws from the conspiracy, he is to be sentenced under the amendments to the guidelines, even if he did not commit an act in furtherance of the conspiracy after the date of the new guidelines[.]

_ F.3d _, No. 04-20322, 2005 WL 2842077 at *4 (5th Cir. Oct. 31, 2005) (second and third alterations in original) (citation omitted) (quoting United States v. Buckhalter, 986 F.2d 875, 880 (5th Cir. 1993)).

14

<u>Booker</u> error by concluding that the conspiracy continued through the effective date of the 2002 Guidelines.

For the foregoing reasons, I would affirm Freeman's sentence[20] and, for that reason, I respectfully dissent.

---

[20]The real question at issue here is whether Freeman's sentence under the 2002 Guidelines violates the Ex Post Facto clause of the Constitution. The Sixth Amendment is only incidental to that question, implicated only if we determine that the sentence violates the Ex Post Facto clause. Because I would find, as explained <u>supra</u>, that the offense continued past the effective date of the 2002 version of the Guidelines, the Ex Post Facto clause of the Constitution is not violated by the application of the 2002 Guidelines to Freeman's sentence.