# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30907

United States Court of Appeals
Fifth Circuit

**FILED**

October 19, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

MICHAEL DEWAYNE WILLIAMS,

> Defendant – Appellant.

Appeal from the United States District Court
for the Western District of Louisiana
No. 5:15-CR-63-1

Before JOLLY and ELROD, Circuit Judges, and STARRETT, District Judge.*

PER CURIAM:**

Michael Dewayne Williams was convicted of eleven counts of wire fraud in violation of 18 U.S.C. § 1343 in connection with a scheme to fraudulently obtain money from the Caddo Parish Commission. Williams challenges his conviction, arguing that it is not supported by sufficient evidence. He also argues that the district court erred in allowing the introduction of inadmissible

---

* District Judge of the Southern District of Mississippi, sitting by designation.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-30907

extrinsic evidence and contends that this same evidence constituted a material variance from the indictment.  Williams also challenges his sentence, arguing that his restitution order was improper. We AFFIRM his conviction and sentence except as to the restitution order, which we VACATE.

**I.**

Defendant Michael Dewayne Williams incorporated SWAG Nation USA, Inc. (SWAG Nation) in September 2012. SWAG Nation focused on character-building for at-risk youth.[1] After organizing SWAG Nation, Williams did not have a formal role within the company. However, his now fiancée, Mary Hughes, was the treasurer.

At the same time, Williams served as a Commissioner on the Caddo Parish Commission. At a public meeting for the Parish Commission, Williams moved for a $100,000 appropriation to fund SWAG Nation's Gentleman's Etiquette Academy. Williams voted in favor of this appropriation, and the measure passed with six votes in favor and five votes in opposition. Williams did not disclose that he was involved in SWAG Nation. According to a commissioner's testimony at trial, commissioners could not vote for appropriations in which they had a financial interest. This same commissioner also testified that he would have voted against the measure had he known that Williams had a financial interest in this appropriation.

After the measure passed, the Parish Commission and SWAG Nation entered into a contract for a youth etiquette program. Under this contract, Caddo Parish Juvenile Court recommended participants for the program, and in turn, SWAG Nation received $350 per participant from the Parish Commission. The Parish Commission paid SWAG Nation *after* each program

---

[1] SWAG stands for "Style With American Glory." SWAG Nation is a program designed to prepare young men for future education and to help them become productive members of society.

No. 16-30907

concluded. That is, SWAG Nation did not receive funds until the program concluded.

After SWAG Nation received its first payment from the Parish Commission, SWAG Nation's financial manager Harold Robinson and Williams met to acquire debit cards for SWAG Nation's bank account. One debit card was issued in Robinson's name, and the other card was issued in Hughes's name. Williams left that meeting in possession of his fiancée's debit card. Over a number of months, Williams used this debit card to make numerous cash withdrawals from SWAG Nation's bank account. The Government presented evidence that Williams's total debit charges amounted to $8,590.68.[2]

After Williams began withdrawing from SWAG Nation's bank account, he told Words in Action, another local organization, about a funding opportunity with the Parish Commission. Words in Action successfully obtained a $14,000 grant from the Parish Commission. Following Williams's suggestion, Words in Action transferred $9,000 of the grant to SWAG Nation, and in exchange, SWAG Nation agreed to complete the youth programming. When SWAG Nation received these funds from Words in Action, its bank account was negative.

When the Parish Attorney learned about the transfer, she informed all parties that this transfer violated the specific Words in Action grant agreement. The Parish Attorney also notified the parties that they would need to repay the money. Williams himself assured the Parish Attorney that the money would be returned. However, $6,100 of the $9,000 were never repaid.

During the initial investigation, Williams met with law enforcement

---

[2] It is unclear why the district court ordered Williams to pay six dollars less ($8,584.68) than this amount in restitution, but this differential is not in dispute on appeal.

No. 16-30907

officers. In this interview, Williams produced a statement, apologizing for his conduct. His statement said, "[M]y role in SWAG Nation USA, Inc. was wrong and unacceptable." He also acknowledged that he used Hughes's SWAG Nation debit card "for personal use."

Williams pleaded not guilty. At trial, Hughes testified that Williams used her SWAG Nation debit card, but she claimed he was authorized to use it as reimbursement for money spent organizing SWAG Nation. She admitted she did not see any receipts for these expenses. At the conclusion of the government's case, Williams moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court denied this motion.

The jury convicted Williams of eleven counts of wire fraud. The district court sentenced Williams to a term of imprisonment of 14 months and ordered restitution in the amount of $8,584.68 to the Parish Commission. Williams timely appealed.

## II.

On appeal, Williams argues that the evidence presented at trial was insufficient to support his conviction. He also contends (1) that the district court erred in admitting evidence of the $9,000 transfer from Words in Action to SWAG Nation, and (2) that the introduction of this evidence constituted a prejudicial, material variance from the indictment. Last, he argues that the district court erred in its restitution order.

### A. Sufficiency of Evidence

Williams challenges the sufficiency of the evidence as to his conviction under 18 U.S.C. § 1343. Because Williams preserved this issue through his Rule 29 motion at trial, the standard of review is *de novo. United States v. Davis*, 735 F.3d 194, 198 (5th Cir. 2013). We view all evidence in the light most favorable to the government and draw all reasonable inferences in favor of the jury's verdict. *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015).

4

"[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To support a wire fraud conviction, the government must prove: (1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud. *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016). Because the parties stipulated to Williams's use of interstate wire communications, the dispute is limited to whether there was a "scheme to defraud" and whether Williams had the "specific intent to defraud."

To prove a scheme to defraud, the government must show that the defendant made a false or fraudulent material misrepresentation. *See Harris*, 821 F.3d at 598. Relevant here, a *concealment* of material facts establishes common-law fraud, as incorporated into this wire fraud statute. *See Pasquantino v. United States*, 544 U.S. 349, 357 (2005). Next, to prove a specific intent to defraud, the government must show the defendant's "conscious knowing intent to defraud." *United States v. Brown*, 459 F.3d 509, 519 (5th Cir. 2006) (quoting *United States v. Reyes*, 239 F.3d 722, 736 (5th Cir. 2001)). Proof of intent can arise "by inference from all of the facts and circumstances surrounding the transactions." *United States v. Keller*, 14 F.3d 1051, 1056 (5th Cir. 1994) (quoting *United States v. Shively*, 927 F.2d 804, 814 (5th Cir. 1991)).

In this case, the evidence was sufficient for a reasonable jury to find Williams guilty of wire fraud. It is rational to conclude that Williams's failure to disclose his relationship with SWAG Nation to the Parish Commission constitutes a fraudulent material misrepresentation by concealment, establishing a scheme to defraud. As a commissioner, Williams was prohibited from voting on an appropriation in which he had a financial interest. Still,

Williams moved to approve a dispersal of funds and then subsequently took these funds from the recipient, a corporation he organized. A reasonable jury could conclude that he did not disclose his relationship with SWAG Nation because he was orchestrating the vote to obtain these funds for his own use.

Likewise, it was reasonable for the jury to find that Williams had a specific intent to defraud. With Hughes conspicuously absent, he obtained and then used a debit card in her name. He also personally instigated a transfer of funds from Words in Action to SWAG Nation, an organization with which he had no formal role, when its bank account balance was negative. In addition, Williams's own statement acknowledged "inappropriate" wrongdoing and his personal use of the funds. In light of this evidence, a reasonable jury could infer that Williams's self-described "inappropriate" conduct involved a conscious knowing intent to defraud.

Williams's sufficiency-of-the-evidence challenge fails.

## B. Admissibility of Evidence

Williams next argues that evidence about the transfer of Words in Action funds to SWAG Nation constituted inadmissible evidence under Federal Rule of Evidence 404(b). Specifically, he contends that the evidence was *extrinsic*, and therefore inadmissible, because the transfer was not part of the alleged scheme to defraud. Williams argues that the Words in Action grant was fundamentally different than the unrestricted funding that SWAG Nation received. Our standard of review for a district court's evidentiary rulings is abuse of discretion. *United States v. Sanders*, 343 F.3d 511, 517 (5th Cir. 2003).

Extrinsic evidence is inadmissible "to prove propensity to commit the charged crime, *see* rule 404(a), but may be admissible for other purposes enumerated under rule 404(b)." *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005). However, "[i]ntrinsic evidence is generally admissible." *Id.* To determine whether evidence is intrinsic, courts consider whether the evidence

is "inextricably intertwined" with the crime charged, whether there was a "single criminal episode," or whether the other acts were "necessary preliminaries" to the crime charged. *Id.* (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)).

The district court did not abuse its discretion in admitting the evidence regarding the transfer of Words in Action funds to SWAG Nation because it was intrinsic to the charged offense involving Williams's scheme to acquire funds through SWAG Nation. As alleged in the indictment and advanced to the jury, Williams devised a scheme to obtain public funds for personal use through SWAG Nation. Like the SWAG Nation appropriation, the Words in Action funding was secured from the same source, the Parish Commission, and—at the suggestion of Williams—placed into SWAG Nation's bank account, to which Williams had access. According to the government, Williams arranged the Words in Action transfer to replenish SWAG Nation's depleted account, concealing his fraud and ensuring personal access to funds in the future. Under the government's theory, the transfer of Words in Action funds was intertwined with and a part of Williams's scheme to obtain funds illegally. As such, the district court did not abuse its discretion in admitting evidence of this transfer.

## C. Material Variance

Williams also contends that the introduction of this same evidence constituted a material variance from the indictment that prejudiced his substantial rights. According to Williams, the evidence was prejudicial because the jury could have inferred that the Parish Commission restricted SWAG Nation's and Words in Action's funds in the same way.

Because the Words in Action funds transfer was intrinsic to the charged offense, his variance argument lacks merit. *See Freeman*, 434 F.3d at 375 (holding that because evidence was intrinsic to the charged offense, there was no variance). As such, his challenge fails.

## D. Restitution Order

Finally, Williams contends that the district court erred in ordering him to pay restitution to the Parish Commission. According to Williams, because the Parish Commission received the full benefit of its contract with SWAG Nation, the Parish Commission is not a victim, and thus, the order of restitution was improper. Because the district court did not focus on the pecuniary impact of Williams's scheme on the Parish Commission, we conclude that its restitution order is improper.

We review the legality of restitution awards *de novo* for preserved challenges. *United States v. Rosbottom*, 763 F.3d 408, 419 (5th Cir. 2014). The Mandatory Victims Restitution Act (MVRA) grants the district court the power to award restitution to victims. 18 U.S.C. § 3663A(a)(1)(A). However, restitution is limited to "only those losses that resulted directly from the offense for which the defendant was convicted." *United States v. Maturin*, 488 F.3d 657, 660–61 (5th Cir. 2007). Here, the dispute is whether the Parish Commission is entitled to restitution for any loss.

In ordering restitution, the court must consider the "victims' loss," not the gross gain by the defendant. *United States v. Klein*, 543 F.3d 206, 215 (5th Cir. 2008). When services are rendered, this court calculates the victim's loss based on the difference between the contract price and the fair market value of the services rendered by the defendant. *See Harris*, 821 F.3d at 605 (applying general loss principles in its review of a district court's determination of the amount of loss for sentencing purposes). As a result, the inquiry centers on the pecuniary impact on the victims themselves. *Id.* at 606. For example, if the victim would have paid some amount of money to the defendant regardless of the fraudulent scheme, then the defendant's gross gain is not equivalent to the victim's loss. *See Klein*, 543 F.3d at 215; *see also Harris,* 821 F.3d at 605–08

(holding that the district court erred when it treated the entire contract price as loss when victims "got what they paid for"); *United States v. Jimenez*, 77 F.3d 95, 99–100 (5th Cir. 1996) (holding that a victim under the Victim and Witness Protection Act suffered no loss when he purchased goods at or below market price from the defendant).

In this case, we conclude the restitution order was improper. There is nothing to suggest that the Parish Commission did not receive the services for which it contracted, nor to suggest that it paid more than the fair market value. The Parish Commission paid SWAG Nation *after* the contracted-for program was held. In doing so, the Parish Commission acknowledged that SWAG Nation had fulfilled its side of the arrangement. Only after this dispersal of funds, essentially a payment for SWAG Nation's services, did Williams begin withdrawing SWAG Nation funds for his personal use. While his scheme necessarily involved the Parish Commission, the Parish Commission suffered no pecuniary loss as a result of Williams's use of the SWAG Nation's debit card. In fact, the Probation Officer testified, based on a phone call with the Parish Attorney, that the Parish Commission was not reporting this amount as a loss of income, and it did not consider itself a victim here.[3] Thus, the Parish Commission was not entitled to restitution.

Nevertheless, without any further explanation, the district court found that the Parish Commission was the identifiable victim of the fraud and ordered restitution in the amount of $8,584.68, the amount of money that Williams charged to the SWAG Nation debit card. Confusingly, the specific amount of restitution is calculated based on the amount Williams took from SWAG Nation, via the debit card, and not the amount dispersed from the

---

[3] The district court also noted during sentencing that the Parish Commission did not pass a resolution to decline to receive or to decline to view itself as the victim in this case.

No. 16-30907

Parish Commission: $16,450. Williams has been ordered to pay the *Parish Commission* based on the amount of money he took from *SWAG Nation*.[4]

In defense of the restitution order, the government cites *United States v. Crawley*, 533 F.3d 349 (5th Cir. 2008). In *Crawley*, the defendant, a union president, was ordered to return his salary and pension to the union because he obtained his president position by voter fraud. 533 F.3d at 359. Similarly, the government argues that it is appropriate for Williams to repay the Parish Commission since the appropriation only passed because he did not disclose his interest in SWAG Nation.

However, *Crawley* is distinguishable. First, in *Crawley*, the defendant argued that only a portion of the restitution award did not constitute an actual loss to the victim. *Id.* at 358. By conceding another part of the restitution order was proper, he implicitly acknowledged that there was *some* harm to the union, to justify awarding restitution.

Second, in *Crawley*, there is no SWAG Nation equivalent lurking in the background. There, the district court calibrated the restitution order in light of the victim: the union. *Id.* at 358–59. Presumably, the union suffered loss when it paid salary and pension to someone who obtained the position by voter fraud. In our case, the government contends that the Parish Commission would not have given money to SWAG Nation if Williams, as a commissioner, had disclosed his financial interest in the organization. Even if this is true, the Parish Commission received the very services for which it contracted: youth programming, and it did not suffer a loss. *See Harris*, 821 F.3d at 605–08.

"Restitution is remedial in nature; its goal is to make the victim whole." *United States v. Sanjar*, 853 F.3d 190, 215 (5th Cir. 2017). Unlike forfeiture,

---

[4] At the time of Williams's sentencing, SWAG Nation was defunct.

10

No. 16-30907

restitution is not punitive. *Id.* When the victim is already whole—having already received contracted-for benefits—restitution is not appropriate.

As the restitution order stands now, it is not focused on the pecuniary impact on the Parish Commission, the identified victim, and as such, it is improper.

## III.

For the foregoing reasons, we AFFIRM his conviction and sentence except as to the restitution order, which we VACATE.