# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 2, 2010

No. 09-30319

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

CHRISTOPHER AUCOIN, also known as C; BOUNTHONG XAPHILOM,
also known as Nick; MISAY CHANDAKHAM; DUC HUU PHAM,

Defendants - Appellants

Appeal from the United States District Court
for the Western District of Louisiana
No. 6:07-CR-60037-8

Before JOLLY, SMITH, and OWEN, Circuit Judges.

PER CURIAM:[*]

In this appeal, four defendants convicted of participating in a conspiracy
to distribute methamphetamine in the New Iberia, Louisiana, area ask us to
reverse their convictions. They bring a variety of challenges to their convictions
and sentences, which we consider defendant by defendant, proceeding in
alphabetical order. After reviewing the trial record, briefs, and oral arguments

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 09-30319

relating to each defendant, we affirm the judgment of the district court as to each defendant.

I.

We begin with a recitation of the facts based on the evidence presented at trial, drawing reasonable inferences in favor of the jury's verdict.

By 2002, Bounthong Xaphilom was manufacturing methamphemine, commonly known simply as "meth," in a shed behind his home in New Iberia and selling it through at least one local dealer, Eng Champkungsing. On February 26, Iberia Parish sheriff's deputies went to Xaphilom's home in the course of investigating reports that Xaphilom was involved in meth distribution. They found him outside the shed, holding money with crystalline powder on it. After his arrest, Xaphilom gave officers permission to search the shed. Inside, they discovered the shed to be a meth lab, and called in a hazmat team. They also discovered meth buried at various locations on the property, seizing 1,028 grams total.

After a state conviction, Xaphilom found himself in jail in Iberia Parish, where he met Phanut Phonchinda some time in 2002. At some point during their time together Xaphilom told Phonchinda that he had been in the fourth year of a five-year plan at the time of his arrest. He wanted to unite the Asian gangs of southwest Louisiana into a drug-dealing alliance called the Nineteen Dragons, and he told Phonchinda that he planned to resume his plan when he was released. In the meantime, Champkungsing continued to sell meth, obtaining it from sources other than Xaphilom.

Xaphilom also met a man named Arthur Basaldua in the Iberia Parish jail. Basaldua, who was from California, arrived in 2004. According to Phonchinda, the two discussed their experience in the drug business and began plans to work together. Xaphilom was not the only one talking to Basaldua about drugs. Through phone calls arranged by Dominic Sonemangkhala, Basaldua, while in

2

jail, contacted various associates, including Duc Pham, regarding the possibility of selling drugs in Louisiana. These calls often concerned the "construction business" (*i.e.*, the drug trade) and "windshield wipers" (*i.e.*, meth). Sonemangkhala was no stranger to the drug trade or to law enforcement. A narcotics task force—a partnership between local authorities and the FBI—had hired Sonemangkhala as an informant after his arrest on drug charges to help them dismantle the Asian drug trade in southwest Louisiana. As he helped Basaldua contact the outside world, he helped the FBI monitor Basaldua's communications.

After his release, Xaphilom found himself incarcerated again, this time in Bakersfield, California. He and Basaldua stayed in touch, however, through the mail and Sonemangkhala-arranged phone calls. One of Basaldua's letters, dated February 13, 2006, asked if Xaphilom was "still down with that power move that we have plan[n]ed out for that world." They also discussed plans to unite after the two regained their freedom. In early 2006, after they were both out of jail, they moved into a house on Henry Street in New Iberia, Louisiana, and began selling meth. Whereas Xaphilom manufactured meth before his arrest in 2002, he and Basaldua now turned to sources in California, including Pham, to supply their new business. Basaldua generally handled the drugs, while Xaphilom used his local connections to find customers and dealers. Xaphilom told his former customer and dealer Champkungsing about Basaldua, and Champkungsing purchased from Basaldua on several occasions, selling to support his habit. Xaphilom also contacted a former coworker, Sammy Thibodeaux, another user-dealer, to tell him he had the "hook up." When Thibodeaux hesitated to buy from Basaldua, whom he did not know, Xaphilom told him that the only way he would get any meth was through Basaldua. Thibodeaux began purchasing an eight ball or two each week from Basaldua, using some and selling the rest, paying about $200 each time. Other times, Thibodeaux would make larger

purchases, up to a half-pound at a time, costing $8,000. The pair also sold to Phonchinda, whom Xaphilom had told about his Nineteen Dragons ambitions in jail, seven times over a three-week period before Phonchinda was arrested. Aucoin, who had met Basaldua in jail, also purchased an eight ball a month, using some and selling the rest to fund his habit.

Another customer was Sonemangkhala, the informant. At a meeting arranged by Basaldua, Basaldua and Xaphilom agreed to sell and Sonemangkhala agreed to purchase an ounce of meth for $2,000. Sonemangkhala, as an informant, first purchased an ounce on June 9, 2006, at the Henry Street residence. On June 30, he purchased another ounce at Henry Street. For his third purchase, he traveled to Los Angeles, California, to purchase directly from Pham. He met Pham behind a gas station and purchased three ounces at a discounted price of $2,400. For each purchase, the FBI gave him cash immediately before and received the drugs immediately after.

As time went on, Basaldua became increasingly fearful that the FBI was watching him. Meth is known to cause paranoia, and like his dealers, Basaldua used the drug frequently. To quell his anxiety, he required female acquaintainces to empty their purses to make sure they were not wired, and he forced a coconspirator, Israel Perez, to ingest meth to prove he was not a police officer. To protect the Henry Street residence, he hired Aucoin to install security cameras. When that proved unsatisfactory, Xaphilom arranged for Basaldua to spend several nights a week with Misay Chandakham, in her Lafayette, Louisiana, townhouse. In January 2007, Basaldua moved there full- time with his girlfriend and her children.[1] Chandakham was an addict, and he paid her in meth. She also pooled her money with her friends to purchase "party packs" of meth that they would consume. Finally, after Basaldua paid to bail her out

---

[1] Xaphilom relocated to Dallas, Texas, but he continued to consult with Basaldua on the drug business by telephone.

No. 09-30319

of jail after an arrest for passing bad checks, Basaldua made her move out of the townhome. He changed the locks and attempted to install a security camera on the roof, though he could not get it to work. All through Basaldua's residency, Chandakham had paid the rent on time and in full, even though she lacked a job or any other apparent source of income.

The conspiracy began to unravel in February 2007. On February 26, Basaldua and Perez were arrested after a high-speed chase in Youngsville, Louisiana. Officers found a bag containing 121 grams of meth, a scale, and a handgun, all of which had been thrown from the car. Basaldua managed to get out of jail, but on March 19 he shot two bail bondsmen. A manhunt involving approximately fifty law-enforcement personnel ensued. Hoping Aucoin could tell them where to find Basaldua, members of the task force went to Aucoin's father's home to ask Aucoin if he could help. Although they received no help from Aucoin, they did see some success, as Aucoin agreed to a meeting two days later to discuss his relationship with Basaldua. At that meeting, without notice of his *Miranda* rights, Aucoin gave the task force information that would eventually be key to his conviction.

The task force interviewed other members of the conspiracy and the grand jury handed down an indictment on October 11. In addition to the appellants, the indictment named Basaldua, Perez, Pham, Champkungsing, Phonchinda, and Joseph—all of whom pleaded guilty, and some of whom would testify against their coconspirators at trial. The indictment charged all of the appellants with one count of conspiring to possess meth with the intent to distribute, *see* 21 U.S.C. §§ 841(a)(1), 846. It also charged Pham with three counts of unlawful use of a communication facility, *see* § 843(b). Before trial, Chandakham moved to sever her trial from her coconspirators, but the district court denied the motion. Aucoin moved to suppress his statement to the task force. The district court assigned the motion to a magistrate judge, who recommend denying the motion

5

after an evidentiary hearing. Aucoin did not object, and the district court denied the motion on the magistrate's recommendation.

The case proceeded to trial. Evidence before the jury consisted primarily of testimony from members of the task force and coconspirators who had pleaded guilty. At the close of the government's evidence, the appellants moved for judgment of acquittal. Aucoin also moved for a severance, though he did not explain the basis. The district court also denied this motion. The jury returned a guilty verdict against the defendants on all counts, and the district court denied the motions for a judgment of acquittal. Aucoin and Chandakham moved for a new trial, and the district court denied those motions. The appellants timely appealed.

II.

We first consider Aucoin's appeal. The indictment charged him with participating in the conspiracy and specifically attributed to him one affirmative act: installing video surveillance cameras at the Henry Street residence.[2] The government argues that it presented evidence showing that his actions supported the aims of the conspiracy in at least three ways: selling meth, installing cameras to protect the Henry Street residence, and selling property to raise money to get Basaldua out of jail. Although there was other evidence at trial, the record shows that the testimony regarding Aucoin's confession was the most significant evidence against him. In an interview with two members of the task force, he described his relationship with Basaldua. The two met in prison. When they were free, Aucoin purchased an eight ball of meth per month from Basaldua, using some and selling the rest to customers he refused to name. He also admitted  installing security cameras at Henry Street in exchange for

---

[2] The indictment reads, "On or about October 27, 2006, CHRISTOPHER AUCOIN, a/k/a "C", installed video surveillance cameras on ARTHUR BASALDUA'S, a/k/a Yogi, a/k/a Joey, a/k/a Art, a/k/a Artie, a/k/a Leo Perez, a/k/a Joe Perez, House[.]"

No. 09-30319

another eight ball of meth and selling an amplifier to help raise bail for Basaldua.  On appeal, Aucoin raises essentially three challenges, two of which relate to his confession.  First, he says the district court should have granted his motion to sever.  Second, he says the district court should have suppressed his confession.  Third, he says that, if the confession was admissible, the government failed to  present sufficient evidence to corroborate his confession.  Reviewing these arguments in order, we find no error and affirm Aucoin's conviction.

## A.

Aucoin first argues that he is entitled to a new trial because the court should have severed his trial from his coconspirators.  A defendant must move for severance before trial, unless he can show cause why he should be able to file at a later date. FED. R. CRIM. P. 12 (b)(5) & (f).  Here, Aucoin moved for severance after the government put on its evidence.  Because he makes no argument on appeal why such a delay was justified, he is not entitled to a new trial.  *United States v. Tolliver*, 61 F.3d 1189, 1198-99 (5th Cir. 1995), *vacated and remanded on other grounds sub nom. Moore v. United States,* 519 U.S. 802, 802 (1996).

## B.

We turn now to whether Aucoin's confession should have been suppressed.

The district court referred the motion to a magistrate judge, who held a suppression hearing.  At the hearing, two members of the task force, Douglas Carr and Shane Landry, testified for the government, and Aucoin testified on his own behalf.  The evidence showed that members of the task force went to Aucoin's father's house looking for Basaldua after he shot the bail bondsmen on March 19, 2007.  Carr explained that the task force urgently needed help finding Basaldua.  Carr also told Aucoin that he was a target of an investigation into meth distribution, a crime that carried serious penalties.  Aucoin told Carr that he had heard from Basaldua that evening but did not know where to find him.

No. 09-30319

Carr and the rest of the task force left soon afterward, but before leaving, Carr told Aucoin that the task force would like to interview him. The task force also left with Aucoin's driver's license, which one member had requested but failed to return. Aucoin arranged a meeting at the office of a lawyer who previously represented him in a personal injury matter.

At the meeting were five or six members of the task force, Aucoin, and his lawyer. The lawyer asked Agent Carr if Aucoin was a suspect in the investigation. After Agent Carr indicated that Aucoin was a target, the lawyer told Aucoin he would be better served by a lawyer familiar with criminal law. Nevertheless, Aucoin was willing to speak to the agents. Carr told Aucoin and the lawyer that it would be better to speak without the lawyer present so he could develop Aucoin as an informant, a condition Aucoin apparently did not protest. Although Aucoin wanted to speak to Carr only, Carr told him that such interviews should involve two agents. Aucoin chose Landry to participate in the interview, which was outside so Aucoin could smoke. During the interview, Aucoin was generally cooperative, confessing his involvement in the conspiracy but refusing to identify those who purchased meth from him. The three witnesses agreed that the task force members never gave him a *Miranda* warning.

After the hearing, the magistrate recommended denying the motion to suppress. The report and recommendation notified Aucoin that failing to object to the recommendation would result in plain-error review on appeal. Aucoin did not object to the recommendation, and the district court denied the motion.

Because Aucoin did not ask the district court to reconsider the magistrate's ruling, which notified Aucoin of forfeiture for failing to ask for review, we review for plain error only. *United States v. Francis*, 183 F.3d 450, 452 (5th Cir. 1999). For us to consider reversing Aucoin's conviction, Aucoin must show that the magistrate's conclusion that he was not in custody was erroneous, that the error

8

was plain, and that the error affected his substantial rights. *United States v. Scher*, 601 F.3d 408, 411 (5th Cir. 2010). Upon such a showing, we have the discretion to reverse if we determine "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citations and quotations omitted).

On this record, we cannot say that the district court plainly erred. *Miranda* warnings are necessary only if "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement to the degree which the law associates with formal arrest." *United States v. Stevens*, 487 F.3d 232, 241 (5th Cir. 2007) (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc)). As Aucoin points out, "a statement by a law enforcement officer that an individual is suspected of illegal activity is persuasive evidence" that a suspect is in custody. *United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir. 1996). But the totality of the circumstances indicates enough voluntariness that any error in the district court's decision was not plain. It was Aucoin's decision when and where to meet, and it was his decision to speak to law enforcement without a lawyer, even after his lawyer told him he should find a criminal lawyer. Moreover, the interview took place outside at Aucoin's request, where he was free to smoke and evidently felt comfortable enough to refuse to answer certain questions. Even assuming the district court erred, the error is not plain. We will not reverse on this ground.

C.

Aucoin next challenges the sufficiency of the evidence against him, arguing that the government failed adequately to corroborate his confession. Before addressing that argument, we must address Aucoin's contention that the government's introduction of evidence tending to prove overt acts not alleged in the indictment amounts to a variance between the indictment and proof. We

have long held that the government's proof is not limited to evidence of the overt acts alleged in the indictment. *See, e.g., United States v. Wilson*, 657 F.2d 755, 763 (5th Cir. 1981). Accordingly, in considering the sufficiency of the government's evidence, we are not limited to evidence concerning Aucoin's alleged installation of the cameras at Henry Street.

As noted above, Aucoin confessed that he bought meth from Basaldua to use and sell it; installed cameras at Henry Street; and sold property to raise bail for Basaldua. Although confessions can be crucial to a conviction, a conviction cannot stand on the confession alone. *Smith v. United States*, 348 U.S. 147, 152 (1954). This rule reflects the reality that defendants sometimes confess to crimes they did not commit. *Id.* When the government offers a defendant's confession as part of its evidence, it must also offer evidence that "fortifies the truth of the confession." *United States v. Deville*, 278 F.3d 500, 506 (5th Cir. 2002) (quoting *United States v. Garth*, 773 F.2d 1469, 1479 (5th Cir. 1985)). This evidence does not, however, need to prove every element of the offense, so long as there is substantial evidence to show the offense was committed and all the evidence is sufficient for the jury to convict. *Id.* In this case, the evidence had to show a conspiracy to possess and distribute meth as defined by 21 U.S.C. §§ 841(a)(1) and 846. Thus, the government had to prove as to each defendant the existence of an agreement to possess meth with the intent to distribute, that the defendant knew of the agreement, and that the defendant voluntarily participated in the agreement. *See United States v. Brito*, 136 F.3d 397, 409 (5th Cir. 1998). There is no need for direct evidence; circumstantial evidence may suffice to show the agreement. *Id.* Evidence that the defendant merely associated with members of the conspiracy is not enough, but such associations can be circumstantial evidence of a conspiracy. *See United States v. Williams-Hendricks*, 805 F.2d 496, 503 (5th Cir. 1986).

No. 09-30319

A review of the record discloses sufficient corroboratory evidence. First, phone records showed 105 phone calls between Basaldua and Aucoin from December 18, 2006, to February 17, 2007—almost two per day—demonstrating a close relationship between the two. Basaldua's girlfriend at the time of the shootings also testified that she went to Aucoin's home to try to get money for Basaldua's bail, showing that people close to Basaldua expected Aucoin to help pay to get Basaldua out of jail. In addition, testimony from Perez that Aucoin installed cameras at Henry Street and FBI surveillance photographs of the installation support Aucoin's admission that he installed the cameras for Basaldua. Futher testimony attested to Basaldua's paranoia, and the jury could reasonably infer that someone who regularly spoke to Basaldua and had a relationship with him was at least generally aware of Basaldua's activities and his fear of law-enforcement detection. Taken together, this evidence supports an inference that he installed the cameras to protect Basaldua's illegal drug activities. In view of this corroboratory evidence, the jury had sufficient evidence to conclude he joined Basaldua in the conspiracy to distribute meth. Finding no error, we affirm Aucoin's conviction.

### III.

Next, we consider Chandakham's appeal. Chandakham's townhouse is where Basaldua moved as he became increasingly concerned with his safety, eventually displacing Chandakham. She makes two arguments against her conviction: first, that the district court should have granted her motion for a separate trial, and second, that the evidence before the jury was insufficient to support her conviction. In addition, she argues that her ten-year mandatory minimum sentence violates the Eighth Amendment. Finding no error, we affirm.

No. 09-30319

A.

Chandakham first argues that the district court should have severed her trial. Unlike Aucoin, Chandakham presented her motion at the appropriate time, so we review for abuse of discretion. *United States v. Sudeen*, 434 F.3d 384, 387 (5th Cir. 2005). Generally, judicial economy calls for trying coconspirators together and "the mere presence of a spillover effect does not ordinarily warrant severance." *United States v. Posada-Rios*, 158 F.3d 832, 863 (5th Cir. 1998) (quotations omitted). To merit reversal, the defendant must show "clear, specific, and compelling prejudice that resulted in an unfair trial." *Id.* She argues that such prejudice existed in two ways: first, that the evidence regarding bad acts of her coconspirators overwhelmed the jury's ability to consider separately the evidence against her, and second, that she was unable to call key witnesses to testify on her behalf. We find no error.

Regarding the first, although Chandakham is certainly correct that the lion's share of evidence concerned other members of the conspiracy, that spillover was not out of the mainstream of conspiracy cases. Especially in the light of the district court's instruction to the jury to consider the evidence separately as to each defendant, we think the "jury could . . . be expected to compartmentalize the evidence as it related to separate defendants." *United States v. Williams*, 809 F.2d 1072, 1084 (5th Cir. 1987). Similarly, Chandakham has not demonstrated a need for a separate trial to obtain exculpatory testimony. To prevail, she must show: "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; [and] (4) that the co-defendant would in fact testify if severance were granted." *United States v. Villarreal*, 963 F.2d 725, 732 (5th Cir. 1992). Regarding the need for a severance to obtain exculpatory testimony, Chandakham's motion stated only: "Counsel for your defendant believes there is potential exculpatory evidence from a co-defendant which will not be available if the co-defendant asserts his 5th

No. 09-30319

Amendment rights at trial." This brief statement failed to argue any of the four necessary factors.  On appeal, her brief and oral argument also omitted any specific argument on the relevant factors.  Accordingly, we will not reverse for failure to grant a severance.

B.

We next consider Chandakham's claim of the insufficiency of the evidence. Our analysis of Aucoin's sufficiency of the evidence argument contains the relevant legal standard for conspiracy to distribute meth, so we will not repeat it here.  Chandakham argues there was no evidence sufficient to allow the jury to infer an agreement to participate in the conspiracy to distribute meth.  We disagree.  Perez, a coconspirator, testified that "Arthur [Basaldua] would give Misay methamphetamine . . . so she could pay the rent," *i.e.*, from sales of meth. Perez further testified that Chandakham became angry when someone she knew started purchasing directly from Basaldua, suggesting that the friend was also her customer who earlier might have been purchasing meth from her.  Given her unemployment and her landlord's testimony that her rent was always paid on time, the jury reasonably could infer an agreement that Basaldua would give Chandakham meth, which she would sell to pay the rent.  The jury had more than enough evidence to conclude that Chandakham joined the conspiracy to distribute meth.

C.

Chandakham also says that her ten-year mandatory minimum sentence violates her Eighth Amendment right to be free from cruel and unusual punishment.  We disagree.  The Eighth Amendment embraces a "narrow proportionality principle," that tolerates severe sentences so long as they are not "grossly disproportionate." *Harmelin v. Michigan*, 501 U.S. 957, 997, 1000-01 (1991) (Kennedy, J., concurring in part and concurring in the judgment).  We cannot say that Chandakham's sentence is so grossly disproportionate that it is

13

No. 09-30319

unconstitutional in the light of other severe sentences we have approved.  *See, e.g.*, *United States v. Cathey*, 259 F.3d 365, 368-69 (5th Cir. 2001).  We affirm her sentence.

IV.

Pham raises two challenges to his sentence, neither of which merits reversal.  First, he argues that the district court violated his Sixth Amendment rights by finding that he possessed a gun in the commission of his crime and applying U.S.S.G. § 2D1.1(b)(1).  He says the jury, not the court, should have made the factual finding. "*Booker* contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing." *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005).  There is no error.  Next, he argues that his counsel was ineffective in failing to object to the amount of drugs used to calculate his sentence.  The record contains insufficient to evaluate that claim on direct appeal. *United States v. Hughes*, 602 F.3d 669, 674 (5th Cir. 2010).

V.

We turn now to Xaphilom's arguments against his conviction and sentence. We should reverse his conviction, he argues, because the evidence at trial proved two conspiracies, whereas the indictment alleged only one.  Regarding his sentence, he makes two arguments.  First, if we find that two conspiracies existed but decline to reverse his conviction, he says he at least deserves to be sentenced only for the conduct relating to the later activity.  Second, he argues that the district court erred by attributing his brother's conviction to him, causing it to deny his request for a variance.  After a review of the record and consideration of the briefs and oral argument, we find no error.

No. 09-30319

A.

We first consider Xaphilom's argument that the proof at trial varied from the indictment. Specifically, he argues that whereas the indictment charged only one conspiracy, the evidence presented at trial showed two. He contends that his 2002 conduct—manufacturing meth for distribution in New Iberia—involved a conspiracy different from his later activities with Basaldua. We determine whether there is a variance by comparing the proof at trial to the allegations in the indictment. *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007). The number of conspiracies is a question of fact, and in the face of a jury's determination that only one conspiracy existed, we will find multiple conspiracies only if the jury lacked sufficient evidence to conclude the activities were part of a single conspiracy. *Id.* In evaluating the evidence, we consider principally three factors: the purposes, means, and composition of the conspiracy. *Id.* at 771. In addition to a variance, Xaphilom would have to show prejudice for us to vacate his conviction. *Id.* We need not, however, reach the issue of prejudice, because we conclude that sufficient evidence exists for the jury to conclude there was a single, continuing conspiracy to profit from the sale of meth in the New Iberia, Louisiana, area.

In 2002, Xaphilom was manufacturing meth in a shed behind his house on a fairly significant scale, as evidenced by seizure of more than a kilogram of the drug at his arrest. Although the government did not introduce much evidence as to the character of the conspiracy in 2002, Champkungsing, who pleaded guilty to the conspiracy charged in this case, told the jury he both consumed and sold meth obtained from Xaphilom both before and after Xaphilom's incarceration, demonstrating a clear connection between the 2002 conduct and the conduct after Xaphilom got out of jail. Once in jail, Xaphilom recruited others to join his meth distribution ring after his release. Phonchinda testified that Xaphilom told him of his incomplete plan to create a Nineteen Dragons

15

gang to dominate the meth trade in southwest Louisiana and that he planned to continue dealing meth after his release. Xaphilom's pitch seems to have worked, as Phonchinda bought drugs from the conspiracy after his release. Xaphilom's most significant jailhouse recruit, of course, was Basaldua, who helped to bring other new members to the conspiracy and provided the connections to import meth from California. Once released, Xaphilom reconnected with his old dealer, Champkungsing, and resumed dealing through him, but now with Xaphilom's jail-mate, Basaldua, as the primary contact in this continuing and growing arrangement. The evidence sufficiently establishes a single conspiracy, both alleged and proved, and we affirm Xaphilom's conviction.

B.

We next consider Xaphilom's sentence. We review sentences for abuse of discretion, reviewing factual findings for clear error and application of the guidelines *de novo*. *United States v. Valencia*, 600 F.3d 389, 433 (5th Cir. 2010) (per curiam). We will not reverse for harmless error. *Id.* Because we have determined that the jury had sufficient evidence to conclude that there was only one ongoing conspiracy, we address only briefly Xaphilom's argument that the the district court should not have considered the drugs seized in 2002. Because possession of those drugs was part of the conspiracy, the district court did not err in considering those drugs to sentence Xaphilom. We turn now to his second argument.

Xaphilom's argument that he should get a new sentence concerns a 1999 conviction for possession of marijuana and drug paraphernalia. His presentence report attributed the conviction to him, but Xaphilom contends it belongs to his brother, Bounnong. He acknowledges that the sentence made no difference to his criminal history category, but he says that the district court might have granted his request for a variance had it not concluded that the 1999 conviction was his. The record, briefs, and oral arguments convince us that the district

court did not clearly err in rejecting Xaphilom's argument, and even if it did, the error would be harmless.

As noted above, the presentence report attributed the conviction to Xaphilom. The district court is permitted to rely on the report unless the defendant shows it is materially unreliable. *United States v. Ford*, 558 F.3d 371, 377 (5th Cir. 2009). Xaphilom filed an objection to the report, stating that he "d[id] not think he pled to this offense." At the sentencing hearing, he provided an uncertified record from the Lafayette Parish Clerk of Court that showed the social security number and date of birth associated with the plea matched those of Xaphilom's brother, Bounnong. The probation officer explained that the presentence report attributed the conviction to Xaphilom because it was in his name and the address also matched. The district court asked Xaphilom if he had any other evidence, but he did not. Having reviewed the record, we cannot say that Xaphilom carried his burden to show that the presentence report was materially unreliable, so we find no clear error. Moreover, the record discloses no reason to believe that the district court would have granted a variance had it not concluded the conviction belonged to Xaphilom. Consequently, even if the district court had erred, that error would have been harmless. Accordingly, Xaphilom's sentence stands.

## VI.

In this appeal, we have thoroughly considered the trial record, the briefs and the oral arguments. We are satisfied that the district court did not commit error, and certainly not reversible error, so the judgment is, in all respects,

AFFIRMED.